**BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**Civ. A. No. J89–0104(B).**

United States District Court, S.D. Mississippi, Jackson Division.

May 3, 1991.

**180**

Dennis Malcolm Barry, Wood Lucksinger & Epstein, Washington, D.C., Ed Davis Noble, Jr., Staff Counsel, University of Mississippi Medical Center, Jackson, Miss., for plaintiff.

L.A. Smith, III, Office of U.S. Atty., Jackson, Miss., Lana Smith, Dept. of Health and Human Serv., Atlanta, Ga., for defendant.

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on the Motion of Plaintiff, Board of Trustees of State Institutions of Higher Learning, for Summary Judgment and the Cross–Motion of Defendant Louis W. Sullivan, M.D., Secretary of Health and Human Services, for Summary Judgment. Both parties have submitted memoranda and documentation in support of their respective positions and agree that the case may be decided on the Motions without trial. Having carefully considered the arguments together with the supporting and opposing memoranda and documentation, the Court is of the opinion that the Motion of Defendant for Summary Judgment is well taken and should be granted for the reasons as set forth below. Accordingly, the Motion of Plaintiff for Summary Judgment is not well taken and should, therefore, be denied.

The ultimate issue in this case is whether Plaintiff, Board of Trustees of State Institutions of Higher Learning ("University"), is entitled to Medicare reimbursement for certain nursing and allied health education costs for the fiscal years ending June 30, 1977, 1978, 1980, 1981, and 1983. Defendant, Secretary of the Department of Health and Human Services ("Secretary" or "HHS"), denied payment of the claimed costs. The Court is presented with an issue of first impression in a federal court. Strong arguments support the positions of both parties, creating difficult decisions. The Court observes that the issue must be firmly decided because potentially vast amounts of money countrywide could be involved. In ruling on the Cross–Motions for Summary Judgment, the Court is asked to review complex legal questions in the area of Medicare reimbursement. It would thus be instructive to review generally the Medicare program and reimbursement procedure.

## I. THE MEDICARE PROGRAM

This case arises under Title XVIII of the Social Security Act ("Act"), which established the federally funded health insurance program commonly known as "Medicare." 42 U.S.C. § 1395 *et seq.* (1976). Congress established the Medicare program to provide health insurance benefits to the elderly and disabled. The program is divided into two parts. Part A, known as the "health insurance program," provides insurance for inpatient hospital and related post-hospital services. 42 U.S.C. §§ 1395c, 1395d. Part B establishes a voluntary program of "supplementary medical insurance" covering physicians' charges and other medical services. 42 U.S.C. §§ 1395k, 1395l, and 1395x(s). This case concerns only Part A of the program.

Medicare beneficiaries are entitled to receive medical services at any facility participating in the Medicare program as a "provider of services." 42 U.S.C. §§ 1395d, 1395x(b). A "provider of services" is defined to include a "hospital, skilled nursing facility, home health agency" and other enumerated types of health care facilities. 42 U.S.C. § 1395x(u). Providers enter into agreements with the Secretary to provide Medicare beneficiaries with a broad range of inpatient services under Part A of the program. To the extent that hospital services furnished to a Medicare beneficiary are covered by the Medicare program, no charge is made to the beneficiary by the hospital (except for certain deductible and coinsurance amounts). 42 U.S.C.

§ 1395cc(a)(1). Instead, the hospital is paid directly by the Government. Since the inception of the Medicare program in 1966, until cost years beginning after October 1, 1983, the Medicare program reimbursed providers for the "reasonable costs" of covered services.[1] "Reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v). "Reasonable cost" is to be "determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies and services...." *Id.*

Administration of the Medicare program is vested in the Secretary of Health and Human Services, who is charged with developing regulations to determine the payment due providers for services rendered to Medicare beneficiaries. 42 U.S.C. § 1395hh. The governing statute, the Social Security Act, requires that the regulations account for both direct and indirect costs incurred by providers under the Medicare program. This ensures that the necessary costs of delivering covered services are not borne by individuals outside of the program and that costs attributable to non-Medicare patients are not borne by the program. 42 U.S.C. § 1395x(v)(1)(A). The most that a hospital receives for furnishing services to Medicare beneficiaries is its costs. There is no reimbursement for profit.

Pursuant to the above statutory authority, the Secretary has promulgated reimbursement regulations. 42 C.F.R. Part 413 (formerly located at 42 C.F.R. Part 405). In addition, the Secretary has issued certain interpretations of the governing statutes and regulations in the Provider Reimbursement Manual ("PRM") and other similar Medicare program manuals. The Medicare cost-based reimbursement system is quite complex, but in essence it requires a two-step process to determine the amount of reimbursement due a provider of services. The first step involves a determination of which costs are "reasonable, necessary and related to patient care" furnished to both Medicare and non-Medicare patients, i.e., a determination of the allowability of the costs. The second step of the reimbursement process apportions allowable costs between Medicare beneficiaries and non-beneficiaries. 42 C.F.R. § 413.1 *et seq.* In this case, apportionment is not the subject of dispute. The disputed issue involves the first step of the reimbursement process—the allowability of the costs.

Under the reasonable cost reimbursement system, payment to a hospital for covered services rendered to Medicare beneficiaries usually is made by HHS through a "fiscal intermediary." 42 U.S.C. § 1395h. The Medicare intermediary reviews and audits an annual "cost report" submitted by each participating provider of services to ascertain whether that provider's costs are "allowable" under regulations and instructions promulgated or published by HHS. *Id.* The final determination as to "reimbursable cost" is made after the close of the provider's fiscal year and is based upon the cost report which the provider is required to file. 42 C.F.R. § 413.20(b).

After receipt of the cost report, the fiscal intermediary must analyze the report, undertake an audit if necessary, and furnish the provider with a written notice of program reimbursement ("NPR") setting forth the total amount of reimbursement due under the program. 42 C.F.R. § 405.1803. Such notice (1) explains how the determination was reached; (2) relates the determination to the provider's claimed total program reimbursement (detailing the reasons why the amount of program reimbursement differs, if it does, from the provider's claim by reference to pertinent provisions of the Act, regulations, or program policy and

---

**1.** The Social Security Act Amendments of 1983 established a prospective payment system ("PPS") for cost reporting periods beginning on or after October 1, 1983. Thus, Medicare payments to hospitals for operating inpatient services are no longer based on cost, but are rather based on prospectively determined rates. Education costs such as those in dispute in this case, however, continue to be cost-reimbursed even under PPS.

procedure); and (3) informs the provider of its appeal rights. *Id.* Subsequent thereto, if the provider is dissatisfied with the intermediary's determination or if the intermediary has failed to issue an NPR within twelve months and the amount in controversy is $10,000 or more, the provider may, within 180 days, request a hearing before the Provider Reimbursement Review Board ("Board" or "PRRB"), a tribunal within the Department of Health and Human Services with exclusive jurisdiction to settle Medicare reimbursement claims. 42 U.S.C. § 1395*oo*.

■ The Board is composed of five persons knowledgeable in the field of cost reimbursement, including two persons representing providers of services. 42 U.S.C. § 1395*oo*(h). It has the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report. 42 U.S.C. § 1395*oo*(d). In proceedings before the Board, the provider, not the intermediary, has the burden of proving its entitlement to greater reimbursement. *Fairfax Hospital Association, Inc. v. Califano*, 585 F.2d 602, 611 (4th Cir.1978). Within 60 days after a Board decision is issued, the Deputy Administrator of the Health Care Financing Administration ("HCFA"), acting on behalf of the Secretary, on his own motion, may reverse, affirm, or modify that decision. 42 U.S.C. § 1395*oo*(f)(1); 42 C.F.R. § 405.1875. Pursuant to the applicable provisions of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, a federal district court has jurisdiction to review the final decision of the Board or the Deputy Administrator. 42 U.S.C. § 1395*oo*(f)(1).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The University, acting through the University of Mississippi Medical Center ("Medical Center"), located in Jackson, Mississippi, operates the University Hospital ("Hospital"), as well as a number of schools, including the University of Mississippi School of Nursing ("School of Nursing") and the University of Mississippi School of Health Related Professions ("SHRP"). The Hospital is a 503–bed acute care teaching hospital that is a major diagnostic and treatment center in the State of Mississippi. The Hospital entered into a provider agreement with the Secretary to provide health care services to Medicare beneficiaries and submitted the cost reports which are the subject of this case.

The Hospital was established as a separate operating division of the University of Mississippi pursuant to Mississippi Laws of 1950 and opened in 1955. The School of Nursing was established by separate legislation in 1948 and the SHRP was established by separate legislation in 1971. The mission of the School of Nursing is to respond to the great need for "additional and better trained nurses in Mississippi" by assuming the "responsibility for providing the people of Mississippi with registered nurses of high professional competence." Miss.Code Ann. § 37–115–51.

The School of Nursing and SHRP offer a mixture of clinical and classroom training so that costs of the two Schools fall into two categories: (1) costs related to classroom time, and (2) costs related to clinical training time. Classroom training is performed by the Schools in their own facilities. Of the clinical training costs, some of the costs relate to clinical training at the Hospital and some of the costs relate to clinical training at facilities other than the Hospital.

Medicare regulation, 42 C.F.R. § 405.421, redesignated as 42 C.F.R. § 413.85, sets forth the requirements for the allowability of education costs. Specifically, the regulation states that Medicare will recognize as allowable:

(1) the net costs of

(2) approved education activities

(3) engaged in by the provider

(4) that are customarily or traditionally carried on by providers

(5) so long as the costs are not redistributed from an educational institution or unit to a patient care institution or unit.

The agency has also issued an interpretation of this regulation in the Provider Reimbursement Manual, discussed below. The Provider Reimbursement Manual is not itself a regulation but is rather a compilation of interpretive rules. It is published by the Health Care Financing Administration, the branch of HHS charged with this duty, and is distributed to providers and intermediaries to instruct them in the application of reimbursement regulations.

From the inception of the Medicare program in 1966, the University had claimed and Medicare had allowed the costs of clinical training relating to the nursing education program. These costs were principally the costs of compensation of the clinical instructors. Based upon the advice of a consultant in 1980, the University increased its reimbursement claim for education costs for all cost reports that were "open" at the time. In its amended cost reports for fiscal years ending June 30, 1977, 1978, 1980, 1981, and 1983, the University claimed Medicare reimbursement for the net costs of the School of Nursing. "Net costs" is defined in Medicare Regulation 42 C.F.R. § 405.421(g), redesignated 42 C.F.R. § 413.85(g), as total costs, both direct and indirect, less tuition, grants, interest income, and donations. Net costs include costs attributable to both classroom time and to clinical training time. For the cost reporting periods under appeal, the University, on the advice of its reimbursement consultants, originally claimed only the total clinical costs of the SHRP. Total clinical costs include costs attributable to both clinical training at the Hospital and other facilities. The University now asserts that it should have claimed, and is entitled to claim, the total net costs of the SHRP, not just the clinical costs.

Blue Cross Association and its subcontractor, Blue Cross & Blue Shield of Mississippi, Inc. (the two entities collectively referred to as the "Intermediary"), were the Medicare fiscal intermediaries under contract with the Department of Health and Human Services in this case. In its original adjustments, the Intermediary made a partial disallowance of the claimed education costs. The Intermediary disallowed the School of Nursing and the SHRP costs related to classroom time and to clinical training time at facilities other than the Hospital. The Intermediary allowed the School of Nursing and the SHRP costs related to Hospital training time as they had been allowed in prior years.

The University argues that the increased claim did not reflect the addition of new programs or the loss of revenue but that it made the University's claim consistent with the successfully presented claims in the *Hahnemann* decision issued by the PRRB, the same Board that denied the University's claims on review. The Secretary's position is that all of these costs have historically been and continue to be covered by appropriations from the State legislature, which would preclude a second payment from Medicare.

The University appealed the Intermediary's cost determinations to the Provider Reimbursement Review Board and requested a hearing. On appeal, the University argued that the provider of health care services in this case should be considered the University of Mississippi and all of its separate operating divisions and that the Medicare program should reimburse the University for the education costs incurred by the Schools. In the alternative, the University argued that, even if the Hospital is the Medicare provider in this case, the Medicare program should reimburse the Hospital for its education costs because the Hospital and the Schools are related parties and the shifting of costs between them does not represent a redistribution of community funds as prohibited by Medicare law. In its prehearing brief to the Board, the Intermediary modified its position, stating that School of Nursing and the SHRP costs related to clinical training at the Hospital should not be allowable. Pursuant to this position, no School of Nursing and SHRP costs would be allowable education costs under Medicare.

On December 29, 1988, after a hearing on this matter, the PRRB issued a decision denying all of the University's claimed education costs for nursing and health related professions. The Deputy Administrator of

the HCFA, acting as the Secretary's delegate, declined to review the Board's decision. The PRRB decision thus stands as a final administrative decision. On February 27, 1989, Plaintiff filed its Complaint in this Court, challenging the Board's decision. The amount of Medicare reimbursement in controversy exceeds $2,000,000.00.

## III. ANALYSIS

### A. *Standard of Judicial Review*

 Judicial review of a decision of the PRRB, or the Deputy Administrator, is governed by 42 U.S.C. § 1395oo(f), which incorporates the standards of Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. In reviewing the case, a court must rely solely on the decision of the PRRB and apply the standard of review in Section 706 of the APA. The APA requires that a reviewing court set aside agency action, findings, and conclusions found to be "arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). In exercising its review of legal questions, a court must accord substantial deference to the interpretation of the agency charged with the administration of a statute. *Connecticut Department of Income Maintenance v. Heckler*, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985). An agency's interpretation of a regulation it has been authorized to promulgate is entitled to great deference and must be upheld unless it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *State of Georgia ex rel. Department of Medical Assistance v. Heckler*, 768 F.2d 1293, 1298 (11th Cir.1985), *cert. denied, State of Georgia ex rel. Department of Medical Assistance v. Bowen*, 474 U.S. 1059, 106 S.Ct. 803, 88 L.Ed.2d 779 (1986). Moreover, the existence of a prior inconsistent interpretation of the challenged regulatory disallowance detracts substantially from the deference due its regulations. *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 991 (7th Cir.1982). "Although an agency is not rigidly bound to its own precedent, the presumption is against changes in established policy that are not justified by the rulemaking record." *St. James Hospital v. Heckler*, 760 F.2d 1460, 1472 (7th Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985).

The PRRB affirmed the adjustments of the Intermediary on several bases. The Board found that, pursuant to the statutory definition contained in 42 U.S.C. § 1395x(u), the Hospital was the "provider of services." The Board further found that only costs incurred by the provider engaged in an educational program are allowable. The Board determined that the Hospital did not document any costs which it had incurred other than those which had already been reimbursed by Medicare and that the attempt to move costs from the books of the School of Nursing and the SHRP to the books of the Hospital, for purposes of the Medicare cost report only, constituted a prohibited redistribution of costs from educational units to patient care units. In the alternative, the Board held that even if the costs had not been redistributed contrary to law in the instant case Plaintiff had failed to demonstrate that the Hospital received a benefit commensurate with the claimed expenditures covering the entire net costs of maintaining these two educational institutions, i.e., that the expenditures were reasonable and related to patient care. 42 U.S.C. § 1395x(v); 42 C.F.R. § 413.9.

### B. *Reimbursement for Medical Education Costs*

 At the time it was enacted in 1965, the Medicare Act did not specifically address reimbursement for medical education costs. Social Security Act of 1965. The legislative history, however, provided that:

Many hospitals engage in substantial education activities, including the training of medical students, internship and residency programs, the training of nurses, and the training of various paramedical personnel. Educational activities enhance the quality of care in an institution, and it is intended that until the

community undertakes to bear such education costs in some other way, that a part of the net cost of such activities (including stipends of trainees as well as compensation of teachers and other costs) should be considered an element in the cost of patient care, to be borne to an appropriate extent by the hospital insurance program.

S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin. News 1943, 1977. The reimbursement regulations promulgated by the Secretary pursuant to statutory authority take into account both direct and indirect costs, but they only permit payment to providers based on the "reasonable cost" of services covered under the Act and related to the care of beneficiaries. 42 C.F.R. § 413.9. Thus, the Medicare program reimburses a hospital for a portion of its net costs of engaging in approved educational activities traditionally carried on by hospitals only to the extent that such costs are allowable as "reasonable costs" and are not redistributed from an educational institution or unit to a patient care institution or unit. 42 C.F.R. §§ 413.9 and 413.85.

This prohibition against redistributing costs is explicated in the regulations:

(c) Educational activities. Many providers engage in educational activities including training programs for residents, and various paramedical specialties. These programs contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical personnel. It is recognized that the costs of such educational activities should be borne by the community. However, many communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing health care. Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities. Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units.

42 C.F.R. § 413.85(c). This regulation enunciates the principle that education costs should be financed by the community rather than patients and that costs funded by the community should not be allowable costs under the Medicare program.

In the Provider Reimbursement Manual § 404.2, HHS has interpreted Section 405.-421 in two different situations: (1) provider-operated education programs, and (2) non-provider-operated programs. In relevant part, Manual § 404.2 states:

[A] provider's reasonable costs associated with approved nursing and paramedical education programs are allowable as follows:

A. *Provider–Operated Programs.*— Costs incurred in these programs including costs of classroom training and costs of clinical training are allowable.

B. *Non–Provider–Operated Programs Supported by Providers.*— ... Costs incurred for the clinical training at the provider are allowable. Costs incurred which are related to the classroom portion are allowable if the following three criteria are met.

1. The provider's support does not constitute a redistribution of non-provider costs to the provider....

2. The provider is receiving a benefit for the support it furnishes.

3. The provider's support is less than the cost the provider would be expected to incur with a program of its own.

### C. *Identity of the "Provider" of Services*

One of the key disputed issues in this case is the identity of the provider of health care services under the Medicare program. The University claims that it, and not the Hospital, is the provider and that therefore all of its costs are reimbursable. The Secretary claims that the Hospital is the Medicare provider and that there-

fore the University's expenditures on behalf of the Schools are not reimbursable. The Board found that the educational programs at issue were non-provider-operated. The Board found that the provider was the Hospital because Section 1861(u) of the Social Security Act defined "provider of services" as "'a *hospital,* skilled nursing facility, home health agency ...'" and because the educational programs were not conducted by the Hospital but were conducted by the School of Nursing and the SHRP. If the nursing and the allied health programs at issue are determined to be provider-operated programs within the meaning of the Medicare regulatory scheme, judgment in favor of the University might be appropriate.

The University argues that HHS has disregarded the uncontested facts of record and the agency's own interpretation of the statute, the regulation, and the manual. The University claims that the Board's conclusion that the Hospital is the provider in this case is inconsistent with the Board's conclusion that the provider is the legal entity in a prior decision with similar facts. *Hahnemann Medical College & Hospital v. Aetna Life & Casualty Co.,* PRRB Dec. No. 81–D33, Medicare & Medicaid Guide (CCH) ¶ 30,985 (March 25, 1981). In *Hahnemann* the Board concluded that the provider was a single corporation that was organized into seven components including a hospital, a medical college, and a college of allied health professions ("CAHP"). The CAHP included a nursing school and other allied health professions programs.

The corporate provider in *Hahnemann* appealed the intermediary's adjustments that had disallowed the net costs of the medical college and the CAHP. In support of its adjustments, the intermediary contended, among other things, that the provider was not engaged in the education activities within the meaning of Section 405.421 because the hospital and schools were separate components of the corporation. Since the components were highly interrelated, however, the Board rejected the intermediary's contention and found that the provider was the corporation, which operated the educational activities.

The Board held that the corporate provider was entitled to reimbursement for the net education costs.

Plaintiff University argued to the Board that the facts of *Hahnemann* are similar to those in the instant case and involve the Board's determination of the provider under 42 C.F.R. § 405.421, the same regulation at issue herein. The Board found in *Hahnemann* that the hospital and CAHP were commonly administered, governed, and operated by a single legal entity, the provider, which operated the educational activities for purposes of 42 C.F.R. § 405.421. Uncontested facts of record in the instant case establish the common governance, administration, and operation of the Hospital, the School of Nursing, and the SHRP by the University acting through its Medical Center.

The Board did not reference *Hahnemann* when it determined in this case that, since the Hospital was the provider, there were no educational activities operated by the provider. The Board relied on the statutory definition of "provider of services," despite the fact that "a hospital" was included in this statutory section in 1981 when the Board decided *Hahnemann.*

The University asserts that the Board's determination of the identity of the provider in the instant case was arbitrary and capricious because it was inconsistent with a prior determination of the Board as to which entity was the provider on similar facts and in regard to the same regulation. *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). Although an agency is permitted to change its policy, "the ground for the departure from prior norms ... must be clearly set forth so that the reviewing Court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Id.* at 808, 93 S.Ct. at 2375. In the instant case the Board did not explain why it was departing from its prior interpretation of "provider" in regard to education costs. Plaintiff argues that the agency's unexplained departure from its prior precedent

was arbitrary and capricious. *Hatch v. Federal Energy Regulatory Commission,* 654 F.2d 825, 834–35 (D.C.Cir.1981); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The court in *Greater Boston* stated this principle of administrative law:

> But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

*Id.* at 852.

Defendant Secretary asserts that a provider may be operated by a corporation, partnership, or other facility but that the provider is the facility itself. Thus, argues Defendant, the Hospital is the provider and the University is the owner of the provider. The Medicare Act's definition of the provider as a hospital is, claims Defendant, controlling. 42 U.S.C. § 1395x(u). Defendant attempts to distinguish the *Hahnemann* decision by stating that the hospital in that case did not receive any redistribution of community funds but funded its programs from its own patient revenues both before and after the reorganization of its educational activities into a separate corporation. That the educational program was never subsidized by the government or the community does not mitigate the finding by the Board that the single legal entity was the provider.

Defendant notes that the district court in *The Board of Trustees of the University of Alabama v. Califano,* No. 76–H–1567–S (Aug. 11, 1978) (N.D.Ala.) (CCH) *Medicare & Medicaid Guide* ¶ 29,251, p. 10,555, 10,557, held that in that case the hospital was the provider and the university was the owner of the provider. The court observed that this is "a distinction without a difference" because a restricted grant to either the provider or owner of the provider for a "specific educational program" would be offset against costs before determining what costs of the School of Nursing would

be allowable to the provider. The Court notes that *Hahnemann* was more recently decided.

Plaintiff further argues that the Secretary has failed to follow his own regulations in determining that the provider is the Hospital. Thus, Plaintiff claims, HHS has defined "provider" in terms of the legal entity that owns and operates the patient care facility; therefore, it was arbitrary and capricious for HHS to have concluded that the provider was not the University of Mississippi, the legal entity. Plaintiff points out that the agency's definition of provider as the legal entity in the certification context enables the Secretary to cast a wide net to recover hospital overpayments from the legal entity ultimately responsible for the hospital. 42 C.F.R. § 489.18. Defendant contends that 42 C.F.R. § 489.18, which deals with changes of ownership of providers, is entirely consistent with the position that the corporate or other legal entity is the owner of the provider. This regulation provides that a change in the legal entity that owns the hospital constitutes a change in the ownership for Medicare purposes, which requires recertification and the execution of a new provider agreement. These provisions are designed to protect the Medicare program. By certifying the entity with the "ultimate responsibility and liability for the operational decisions of the institution," and having the corporation as well as the institution's trade name on the provider agreement, the agency ensures that it can recover overpayments due the program from the legal entity responsible for the hospital's actions. *See* 42 U.S.C. § 1395g; 42 C.F.R. § 405.454, redesignated as 42 C.F.R. § 413.64. Plaintiff contends that HHS cannot have one definition of "provider" to recover monies from the program and a different definition of "provider" to avoid making payments by the program because the term "provider" should be defined consistently throughout the same regulatory scheme. *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932) ("[T]here is a natural presumption that identical words used in different parts of

the same act are intended to have the same meaning."); *Yamaguchi v. State Farm Mutual Automobile Insurance Co.,* 706 F.2d 940, 947 (9th Cir.1983).

On the other hand, the Secretary claims that this provision is consistent with the position that the corporate or other legal entity is the owner of the provider. There is no unfairness or inconsistency because under the statute and the regulations all of the assets of the University are available to satisfy an overpayment to the Hospital, while all the costs of operating the University are not attributable to the Hospital. If, as herein, a large number of businesses are conducted by a single entity, then all of the assets of the entity are at risk to satisfy the debts of any of the businesses. Moreover, Section 2012 of the State Operations Manual, entitled "Identifying Eligible Providers and Suppliers," states in relevant part:

> Provider institutions are often complex health care delivery institutions centered around primary short-term hospitals. Although a totally new hospital may be rare, provider complexes frequently recombine and reform. This may or may not create new certification entities. In general, if the statute or regulations provide for separate certification of satellite components, they must be separately certified, e.g., a distinct part SNF in a hospital. In some instances a satellite's certification is dependent upon the primary provider being approved to participate, e.g., a hospital-based hospice or an ESRD transplant center. Recognize and act upon organizational combinations, and complete a Certification and Transmittal, HCFA–1539, to reflect a change. A provider is the party having ultimate responsibility and liability for the operational decisions of the institution. Consequently, you need to know what components are under the control of the provider's governing body (as opposed to being loosely affiliated), and when the governing body's control of a component has changed.

Defendant notes that one entity may encompass more than one provider, e.g., a hospital and a skilled nursing facility ("SNF"). If, Defendant claims, the legal entity were synonymous with the provider, a corporation which operated a hospital, a home health agency, and a skilled nursing facility would be a single provider. This is clearly not the case. Each facility is separately certified, and a separate provider agreement is executed by the corporation on behalf of each.

■ The Court is of the opinion that, under the facts of this particular case, the provider of services is the University. The Court concludes that *Hahnemann* was wrongly decided but that the decision is binding on HHS because the Board failed to distinguish that case. Therefore, the University was entitled to rely on that case.

The board in *Hahnemann* improperly determined that the provider was the single umbrella corporation organized into seven components. The express statutory definition of "provider of services" is "a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, or home health agency, hospice program, or, ... a fund." 42 U.S.C. § 1395x(u). The identical definition was operative when *Hahnemann* was decided, and the Board ignored the Congressional mandate at that time.

The Court finds that the Secretary's arguments in the instant case that the provider is the Hospital are well taken. However, the Secretary's position in this case must fail because this case fits squarely on virtually all fours with *Hahnemann* and the Board did not distinguish that decision. The Board in the instant case departed from the analysis in the *Hahnemann* decision without explanation. The Board had an obligation, which it failed to fulfill, to explain its inconsistent decision on virtually identical facts. Furthermore, "[t]he existence of such a prior inconsistent interpretation of the challenged regulatory disallowance detracts substantially from the deference normally due an agency's interpretation of its own statute and regulations." *Northwest Hospital, Inc.,* 687 F.2d at 991.

■ Plaintiff University has a right to bind HHS to its decision in *Hahnemann.* Because an agency's decision formulates

and announces policy, such decision provides "a guide to action that the agency may be expected to take in future cases." *Atchison*, 412 U.S. at 807, 93 S.Ct. at 2375. Thus, an agency has a duty to explain its departure from prior norms so that the reviewing court may understand the basis for the agency's action. *Id.* at 808, 93 S.Ct. at 2375. The Court has no basis by which to understand the Board's departure from its prior determination of the identity of the provider on similar facts because the Board declined to reference and discuss *Hahnemann.*

Defendant argues that in *Hahnemann* there was a "critical absence" of redistributed community funds, in contradistinction to the present case. The Court notes, however, that the presence or absence of government appropriations in the instant case does not negate the analysis and determination by the board of the identity of the provider in *Hahnemann.* Accordingly, the Court concludes that, even though *Hahnemann* was wrongly decided, the decision is dispositive of the identity of the provider under the particular facts in the instant case. Accordingly, the provider of health care services is the University.

### D. *Community–Supported Education Costs*

Having determined that the University is the provider of services, the Court turns to the question of whether the community has undertaken to bear the education costs for the Schools, precluding reimbursement by the Medicare program.

■ Defendant asserts that Plaintiff seeks Medicare reimbursement for educational costs which have already been fully funded by the State of Mississippi. In so seeking, Defendant claims, Plaintiff attempts to force taxpayers to pay twice for the same services: once through Mississippi state taxes and again through federal social security taxes. Thus, argues Defendant, by including expenses on its costs report that the community has already borne, Plaintiff has violated the fundamental principles of Medicare reimbursement for educational costs. The Medicare program cannot subsidize the cost of maintaining educational institutions for which the community bears full responsibility and financial support. 42 C.F.R. § 413.85. *St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803 (7th Cir.1979). The extent to which the Medicare program is required to reimburse educational costs is a matter within the purview of Congress. The legislative history of the Act demonstrates that Congress intended to prohibit community-supported education costs from being shifted to the Medicare program and to prohibit those education costs from being reimbursed twice—through state appropriations and through the Medicare program. *See* S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News at 1943, 1977.

Consistent with the Medicare Act and the legislative history thereof, the Medicare regulations set forth three fundamental principles relating to the reimbursement of medical education costs: (1) these costs should ultimately be borne by communities; (2) to the extent that costs are not yet borne by the communities, the Medicare program will share in a part of those costs, assuming they are reasonable, related to patient care, and represent approved educational activities engaged in by hospitals and which are customarily or traditionally carried on by hospitals; and (3) under no circumstances will the Medicare program share in costs which have been redistributed from educational institutions or units to patient care institutions or units. 42 C.F.R. § 413.85. *St. John's Memorial Hospital, Inc.,* 599 F.2d at 803.

These principles are also reflected in Section 404.2 of the Provider Reimbursement Manual, which states:

The responsibility for operating and supporting approved education programs which are necessary to meet the community's needs for nursing and paramedical personnel should be borne by the community. Where the community has not yet recognized and accepted this responsibility, the Medicare program does participate appropriately in the support of such approved programs as are operated by

providers in conjunction with their patient care activities.

 Defendant claims that, during each of the years at issue, State appropriations, along with tuition revenues and grants, have fully provided for the entire expenses of the School of Nursing and the SHRP. The State of Mississippi created the School of Nursing in 1948 and the SHRP in 1971 and has since then directly appropriated amounts to each School sufficient to cover its net costs of operations. In creating the School of Nursing, the State legislature placed full responsibility for the School on the Board of Trustees of State Institutions of Higher Learning:

Said board of trustees shall provide for such school, such buildings and equipment, and such teaching staff and other personnel as may be deemed appropriate for the establishment and operation of such school of nursing and for the performance of the other functions herein provided for, all which shall, however, be done within the appropriations made for such purposes.

Miss.Code Ann. § 37–115–51; A.R. at 1693. The Administrative Record ("A.R.") reflects that the Mississippi legislature has, since the inception of the Schools, made annual appropriations to the Schools for the purpose of advancing specific educational programs. The annual State appropriations, students' tuition, grants, and other fees were meant to cover the entire operating costs of the Schools. The Intermediary's Posthearing Brief submitted following the PRRB hearing provided the following illustrative charts:

School of Nursing

| Fiscal Year | State Appropriations | Net Costs[2] | Excess (Deficit) of State Appropriations Over Net Costs |
|---|---|---|---|
| 1977 | $1,068,104 | $1,120,592 | $(52,488) |
| 1978 | 1,335,079 | 1,262,921 | 72,158 |
| 1979 | 1,527,649 | 1,372,806 | 154,843 |
| 1980 | 1,748,852 | 1,699,034 | 49,818 |
| 1981 | 1,940,300 | 2,037,471 | (97,171) |
| 1982 | 2,248,434 | 2,213,291 | 35,143 |
| 1983 | 2,122,764 | 2,172,413 | (49,649) |

Total Excess for Years 1977–83: $112,654
Plus Unappropriated Current Surplus at 7/1/76: 250,287
Unappropriated Current Surplus at 7/1/83: $362,941

School of Health Related Professions

| Fiscal Year | State Appropriations | Net Costs | Excess (Deficit) of State Appropriations Over Net Costs |
|---|---|---|---|
| 1977 | $ 787,401 | $ 744,968 | $ 42,433 |
| 1978 | 880,810 | 767,844 | 112,966 |
| 1979 | 939,194 | 879,908 | 59,286 |
| 1980 | 1,061,698 | 1,029,906 | 31,792 |
| 1981 | 1,230,912 | 1,198,381 | 32,531 |
| 1982 | 1,506,875 | 1,431,142 | 75,733 |
| 1983 | 1,421,536 | 1,502,472 | (80,936) |

Total Excess (Deficit) for Years 1977–83: $273,805
Plus Unappropriated Current Surplus at 7/1/76: -0-
Unappropriated Current Surplus at 7/1/83: $273,805

---

2. Net costs were calculated by subtracting student tuition, grants, and other fees from total costs of the Schools. This calculation gave no consideration to the State appropriations.

A.R. at 242–43, 296–306. Thus, during the years in question, both Schools made a profit. The community, the taxpayers of the State of Mississippi, have through state appropriations assumed responsibility for and paid for the costs of maintaining and operating these Schools. Furthermore, assuming that the State legislature would reduce its appropriations for the Schools in the future to reflect the additional Medicare funding, an impermissible transfer of the community-supported education costs to the Medicare program would result.

■ Plaintiff asserts that the PRRB made no finding of fact or conclusion of law regarding State appropriations. A reviewing court may not uphold a decision of an administrative agency on a ground not found by the agency itself. *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). Plaintiff's counsel argues that the Board's decision refers only to "redistributions" and not to "redistributions of community funds." Plaintiff argues that the Board's finding that there was a prohibited redistribution was not the same as a finding that the costs at issue were funded by a state appropriation. Plaintiff asserts that Defendant has improperly rewritten the Board's decision. Thus, the University contends that, since the Board did not address this issue, the Court can not uphold the decision of the PRRB on this ground.

■ The Court, however, is of the opinion that funding through the appropriations made by the State to the Schools for educational purposes is one basis for the Board's ruling. The Board's decision sets out the positions of both parties with respect to this issue:

> The Provider maintains that State appropriations need not be offset against total costs in calculating net costs because State appropriations are internal transfers of funds....

> In this case the Intermediary contends that the Hospital has never had to support the operations of the Schools through patient care revenues. Rather, the State of Mississippi has supported the Schools through State appropriations and has paid for the cost of operating these schools.... The Intermediary argues that 42 C.F.R. § 405.421 (now 42 C.F.R. § 413.85) prohibits Medicare from participating in increased costs by the redistribution of costs from educational units to patient care units. The Intermediary claims that the purpose of the redistribution provision is to discourage the community (in this case, the State of Mississippi) from halting funding of educational activities and passing the responsibility to the Hospital (and to the Medicare program).

The Board concluded that "the Intermediary's determination was proper based on its revised position that none of the costs the University incurred in educating students at [the Schools] is allowable." Citing the portion of 42 C.F.R. § 413.85(c) which addresses community support and redistribution, the Board further held that "there has been a redistribution of costs from the School of Nursing and the SHRP to the Hospital." Furthermore, these two concepts, which are contained within the same paragraph of 42 C.F.R. § 413.85, must be read together.

The University does have a colorable argument that the PRRB did not directly address the issue. Certainly, the Board failed to address the issue with the proper clarity that such an important decision would demand. Even though the finding is ambiguous, it is more than arguable that the PRRB addressed the redistribution of community funds and the community support for medical education costs issues. Furthermore, the Record illustrates the fact that the State of Mississippi has historically paid for the operation of these Schools. A.R. at 241–42, 296–306. The Court thus finds that the Board upheld the position of the Intermediary regarding the coverage of the net costs of the operations of the Schools through community funds. The State appropriations for the School of Nursing and the SHRP constitute community support of education costs. Reimbursement of these costs from the Medi-

care program would result in a double recovery by Plaintiff for the years at issue. Accordingly, the Court is of the opinion that one basis of the Board's decision to deny the claimed reimbursement was that the claimed medical education costs are community supported.

### IV. CONCLUSION

The Court has determined that, in the instant case, the University is the provider of services but that conclusion does not mandate that the claimed costs should be reimbursed by the Medicare program. The education costs at issue are not reimbursable because those costs have already been fully funded by the community through appropriations from the State legislature. The community support provisions of the Medicare reimbursement regulations preclude a windfall recovery. The Court finds the Secretary's decision to deny the University Medicare reimbursement for certain nursing and allied health education costs for the fiscal years ending June 30, 1977, 1978, 1980, 1981, and 1983 consistent with the requirements of the Medicare Act and regulations. Such requirements are based on the policy that providers cannot expect the Medicare program to subsidize the costs of medical education programs already supported by the community.

Accordingly, the Court affirms the administrative decision of the Secretary and denies the Motion of Plaintiff for Summary Judgment.

IT IS, THEREFORE, ORDERED that the Motion of Defendant for Summary Judgment is hereby granted and that the Motion of Plaintiff for Summary Judgment is hereby denied. A separate judgment will be entered in this cause.

SO ORDERED.