The OHIO STATE UNIVERSITY
d/b/a Ohio State University
Hospitals, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant.

No. C2–90–905.

United States District Court,
S.D. Ohio, E.D.

Nov. 13, 1991.

Diane Marie Signoracci, Bricker & Eckler, Columbus, Ohio, for plaintiff.

Joseph E. Kane, U.S. Attorney's Office, Columbus, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

This is an appeal from a decision of the Administrator of the Health Care Financing Administration ("Administrator") acting on behalf of the Secretary of Health and Human Services ("Secretary") denying plaintiff's claim for provider cost reimbursement under the Medicare Program, 42 U.S.C. § 1395 *et seq.*

Plaintiff The Ohio State University, d/b/a Ohio State University Hospitals (the "Provider") is a state-owned, 905–bed acute care teaching hospital located in Columbus, Ohio. The Provider is a separate administrative division of the University and operates a Medicare-approved graduate medical education program ("GME program") for interns and residents. The University's College of Medicine ("COM") administers the GME program.

While the Medicare Act itself does not specifically address reimbursement for medical education costs, its legislative history indicates that Congress recognized that many hospitals engage in educational activities which enhance the quality of patient care and that the cost of such activities should be considered an element in the cost of patient care to be borne to an appropriate extent by the Medicare Program. S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 1977. The Secretary has adopted regulations authorizing the reimbursement of certain medical education costs. 42 C.F.R. § 413.85.

In administering the Medicare Program the Secretary contracts with fiscal agents known as intermediaries. 42 U.S.C. § 1395h. Intermediaries review cost reports submitted by providers at the end of each fiscal year in order to make a final determination of the reimbursable costs which may be allowed to the providers. 42 U.S.C. § 1395g; 42 C.F.R. §§ 413.20(b), 413.24(f), 413.60.

Since the inception of the Medicare Program, the Provider has claimed and received reimbursement for certain direct costs relating to the GME program. In 1985 the Provider employed a Medicare reimbursement expert to review its cost reports to insure that it was recouping all costs permitted by law. As a result of this individual's advice, the Provider included indirect costs, variously referred to as overhead or general and administrative (G & A) costs related to the GME program for fiscal year 1985. The intermediary disallowed these costs, resulting in a reduction in the Provider's Medicare reimbursement in the approximate amount of $765,000. The Provider requested a hearing before the Provider Reimbursement Review Board ("PRRB"). The PRRB is a panel of five individuals appointed by the Secretary whose responsibilities include the mediation of disputes between providers and intermediaries. The members of the PRRB are required by statute to be knowledgeable in the field of medicare cost reimbursement and at least one of them must be a certified public accountant. 42 U.S.C. § 1395*oo* (h). On August 17, 1990 the

PRRB reversed the intermediary, holding that:

> The amounts of graduate medical education and physician administrative costs claimed by the Provider are allowable related-party costs subject to audit by the intermediary.

PRRB decision, p. 18. The Administrator then notified the parties of his intention to review the PRRB's decision, and on October 16, 1990, the Administrator reversed the PRRB, holding that the claimed costs were not allowable graduate medical education costs. The Provider appealed the Administrator's decision to this Court and the case is now before the Court on the parties' cross motions for summary judgment.

The Administrator denied Provider's claim for overhead and administrative expenses related to its GME program on two grounds: first, that reimbursement would violate the Secretary's regulation against redistribution of the costs of an educational institution, 42 C.F.R. § 413.85(c), and second, that the overhead and administrative costs are not allowable costs for Medicare purposes under Medicare law and regulations.

## STANDARD OF REVIEW

Judicial review of the Administrator's decision is governed by 42 U.S.C. § 1395oo (f) which incorporates the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706. This standard requires a court to set aside agency action "which is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; contrary to a Constitutional right, power, privilege or immunity; or unsupported by substantial evidence where an agency hearing is being reviewed on the record." *Bedford County General Hospital v. Heckler,* 757 F.2d 87, 89 (6th Cir. 1985). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

█ An administrative agency's interpretation of its own regulations is accorded considerable deference unless it is inconsistent with the plain language of the regulations. *University of Cincinnati v. Heckler,* 733 F.2d 1171, 1173–74 (6th Cir.1984); *University of Cincinnati v. Bowen,* 875 F.2d 1207, 1208 (6th Cir.1989). Although an agency's decision is entitled to a presumption of regularity, a reviewing court is required to engage in a thorough, probing, in-depth review. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

## THE ISSUE OF DISTRIBUTION

█ Medicare regulations specifically authorize the reimbursement of the cost of certain educational activities. The following principles govern the reimbursement of such costs:

1. The education program must be approved.

2. The program must contribute to the quality of patient care within an institution.

3. Until communities undertake to bear these costs, the program will participate appropriately in the support of these activities.

4. It is not intended that the program should participate in increased costs resulting from redistribution of costs from educational institutions to patient care institutions.

42 C.F.R. § 413.85(c). *University of Cincinnati v. Bowen,* 875 F.2d at 1210; *St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803, 809–810 (7th Cir. 1979). It is uncontroverted that the Provider's GME program is approved and does contribute to the quality of patient care within the hospital.

The intermediary based its disallowance of the Provider's GME overhead costs in part on a finding that reimbursement would violate both the community support and redistribution principles set forth in 42 C.F.R. § 413.85(c). The PRRB disagreed, finding that reimbursement would violate neither principle. In reversing the PRRB and finally denying reimbursement, the Ad-

ministrator relied only on the principle of redistribution. In this respect, the Administrator's decision differs from his decisions in *Thomas Jefferson University Hospital v. Aetna Life Insurance Co.*, CCH Medicare & Medicaid Guide, § 38,353 (Jan. 18, 1990) and *University of Minnesota Hospitals v. Blue Cross & Blue Shield Assoc.*, CCH Medicare and Medicaid Guide § 39,-420 (May 29, 1991) in which he invoked the community support principle of the rule and found that reimbursement of G & A costs should be disallowed because they had historically been borne by the community. This also distinguishes the present case from *Board of Trustees of State Institutions of Higher Learning v. Sullivan*, 763 F.Supp. 178 (S.D.Miss.1991).

■ The Court concludes that the Secretary did not rely on the community support principle because the evidence in this case would not support a finding that the community had undertaken to bear the overhead expenses of the Provider's GME program. The record here discloses that the Provider has historically transferred substantial funds to the COM in general support of its services to the GME program (seven million dollars in fiscal year 1985) and that from fiscal year 1983 through fiscal year 1988, the Provider incurred operating losses of approximately fifteen million dollars. In any event, since the Secretary did not rely on the principle of community support, that issue is not before the Court. An agency's decision must be upheld, if at all, on the same basis articulated by the agency itself. *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974).

■ The redistribution principle of the rule is stated in the following language:

... Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units.

42 C.F.R. § 413.85(c). A threshold question in interpreting the rule is the meaning of "costs" in the context of Medicare reimbursement regulations. Are they limited to expenses actually incurred and paid by the provider? Are they limited to direct costs? Clearly, the answer to both of these questions is no.

The provisions of 42 C.F.R. § 413.17(a) expressly authorize reimbursement of costs applicable to services, facilities and supplies furnished to a provider by organizations related to the provider by common ownership or control:

(a) *Principle.* Except as provided in paragraph (d) of this section, costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

The College of Medicine and the hospital are both owned by the University. The Secretary has recognized the College of Medicine as a related organization within the purview of 42 C.F.R. § 413.17 and has always approved reimbursement for the directs costs of the GME program provided by the College of Medicine.

The provisions of 42 C.F.R. § 413.85(g) expressly authorize reimbursement of both direct and indirect costs of approved educational activities:

*Calculating net cost.* Net costs of approved educational activities are determined by deducting, from a provider's total costs of these activities, revenues it receives from tuition. For this purpose, a provider's total costs include trainee stipends, compensation of teachers, and *other direct and indirect costs of the activities* as determined under the Medicare cost-finding principles in § 413.24. (Emphasis added).

Indirect costs include overhead. *University of Cincinnati v. Bowen*, 875 F.2d at 1208. "The costs of approved educational activities, such as stipends paid to residents

and related overhead, are ordinarily included as reasonable costs." *Id.*

The Administrator's finding that the allowance of the Provider's GME overhead and administrative costs would violate the redistribution principle of 42 C.F.R. § 413.-85(c) is based primarily on the fact that these costs had not previously been claimed by the Provider as GME costs. The Administrator noted at page 4 of his decision, "The overhead costs of the medical school claimed here had not previously been claimed by the Provider as GME costs."

The Administrator went on to state, at page 5 of the decision:

> The Provider maintains that, although it has not claimed these costs in prior years, there is no redistribution of the cost of the medical school to the Provider...., the Provider states that it has always paid these costs. Although the Provider has alleged that it has always paid these costs, it also stated that these costs have been absorbed by the Provider *and* the college. There is, however, no evidence, in the record identifying these costs as having been incurred or reported by the Provider in prior years.

> Therefore, although the Provider alleges that there is no redistribution of costs, there is no evidence in the record to support the Provider's allegation. This information is within the purview of the Provider. The record does not support the allegation that the Provider incurred these costs in prior years. If these costs were paid as the Provider alleges, the record does not explain how these costs were treated on the Provider's cost report for those years or what effect this had on Medicare reimbursement.

Aside from quoting the redistribution provisions of the regulation, the above constitutes the totality of the grounds given by the Administrator for disallowing these costs under 42 C.F.R. § 413.85(c).

■ It is clear from the Administrator's reasoning that his denial of reimbursement was based on an interpretation of the rule which requires a provider to show that it has historically incurred, paid and reported GME costs in order to avoid the redistribution prohibition. The Administrator seems to have applied the "customary and traditional" test to paying and claiming the cost of the educational activities instead of the performance of the educational activities. The Court finds that such an interpretation is not consistent with the plain language of the regulation and conflicts with the provisions of other regulations and the Medicare statute itself.

The prohibition against redistribution is embedded in a clause which begins with a declaration of the program's intent to share in the support of educational activities "customarily or traditionally carried on by providers in conjunction with their operations." 42 C.F.R. § 413.85(c). It is the activities which must be customary and traditional, not the provider's practice of paying for them or claiming reimbursement for them. Redistribution is not defined, but in context it is linked both to the customary and traditional educational activities of providers and to a declaration of the program's intent not to participate in "increased costs resulting from the redistribution of costs from educational institutions or units to patient care institutions or units." *Id.* The regulation's reference to both educational institutions and educational units indicates that the redistribution principle focuses on activities as opposed to entities.

The regulation expresses the intent of the Medicare program to share in the support of educational activities carried on by providers. This is consistent with the legislative history of the statute which reflects Congress's intent that the Medicare program pay its fair share of educational activities which contribute to the quality of patient care. S.Rep. No. 404, *supra.* The regulation further reflects an intent to limit such support to the kinds of educational activities customarily or traditionally carried on by providers in conjunction with their operations. It is not entirely clear whether this refers to the kinds of educational activities customarily or traditionally carried on by providers in general or by a specific provider. It seems more likely that the former is intended, but in this

case it is not necessary to decide that point since the educational activities here in question are of the kind customarily and traditionally carried on by teaching hospitals in general and by this Provider in particular. The record shows that the Provider has historically operated its GME program using the services of the College of Medicine. Thus, it is clear that this educational activity is one which has customarily and traditionally been carried on by this Provider in conjunction with its operations.

Teaching hospitals traditionally and customarily engage in the clinical training of graduate physicians in the hospital setting. Ordinarily they do not engage in classroom training, undergraduate medical education or other nonclinical educational activities. These nonclinical medical educational activities are customarily and traditionally carried on by educational institutions. Hospitals often engage in educational activities with respect to other health care occupations. A list of recognized professional and paramedical educational training programs is found in 42 C.F.R. § 513.85(e) and it includes such programs as professional nursing, practical nursing, occupational therapy, pharmacy, physical therapy, and x-ray technology. The customary or traditional role of a hospital in such educational programs would undoubtedly vary, depending on the kind of training involved.

In the case of graduate medical education, it would be customary and traditional for a teaching hospital to employ qualified physicians in various medical specialties to select and supervise the interns and residents enrolled in the educational program. These physicians would need clerical and administrative staff, office space and supplies to carry out their function. Their salaries, the salaries of their clerical and administrative staffs, and the cost of their office space and supplies would all be part of the cost of the educational activity which ultimately contributes to the quality of patient care in the hospital. Such costs would be the traditional and customary costs incurred by a teaching hospital engaged in a graduate medical education program. They would be the kind of costs Congress intended that the Medicare program should participate in. If the Medicare program did not pay its fair share of these costs, there is a likelihood that they would be shifted to non-Medicare patients in violation of the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A), which prohibits the shifting of the necessary direct and indirect costs of delivering health care services from Medicare to non-Medicare beneficiaries.

Thus, the Court concludes that the plain meaning of 42 C.F.R. § 413.85(c) is to allow providers to receive reimbursement for a fair share of all direct and indirect costs related to educational activities customarily or traditionally carried on by providers in conjunction with their operations.

The prohibition against redistribution of costs from educational institutions or units to patient care institutions or units seems to be intended to guard against a situation in which a provider would undertake educational activities beyond those which are customary and traditional and ask the Medicare program to participate in such increased costs. For instance, a hospital might expand its educational activities to include nonclinical educational activities, such as undergraduate instruction or other activities customarily and traditionally carried on by educational institutions but not customarily and traditionally carried on by patient care institutions. These would be increased costs which the Medicaid program will not participate in.

Thus, the Court concludes that the plain meaning of the regulation is to authorize reimbursement of all direct and indirect costs related to the kinds of educational activities customarily or traditionally carried on by providers, but to deny reimbursement for costs related to educational activities which are customarily or traditionally carried on by educational institutions, such as medical and nursing schools. The Court concludes that the underlying purpose of the redistribution principle is to limit reimbursement to educational costs related to patient care and to deny reimbursement for educational costs unrelated to patient care.

In order to find that the allowance of GME administrative and overhead costs would violate the rule against redistribution of claimed costs from educational institutions or units to patient care institutions or units, there would have to be evidence that the costs included purely educational costs unrelated to patient care, such as the cost of undergraduate medical education programs or nonclinical graduate medical education programs. There is no evidence that this occurred in the present case.

■ The Administrator seems to have concluded that since these costs had not been claimed in prior years, there was an irrebuttable presumption that they represented a redistribution of the costs of the medical school to the Provider. Where a provider gives a legitimate explanation for its failure to report or claim the costs in prior years, a refusal to consider the allowability of the costs is arbitrary and capricious.

The regulations do not prohibit all shifting of costs from educational institutions or units to patient care institutions or units. Only improper cost shifting is prohibited. So long as the educational activities enhance the quality of Medicare patient care in the hospital, such costs

> are *properly* shifted to the patient care institution and its Medicare beneficiaries. This comports with the underlying statute, 42 U.S.C. § 1395x(v)(1)(A), which prohibits shifting necessary direct or indirect costs of providing services from Medicare beneficiaries to non-Medicare beneficiaries. Therefore, by allocating a proper amount of the clinic costs to the Medicare Program, it has not "participated[d] in increased costs resulting from redistribution of costs from educational institutions to patient care institutions." 42 C.F.R. § 405.421(c) (1982). The Hospital seeks only reimbursement for the *allocable* share of costs, *i.e.*, the costs equal to the proportion of Medicare patients at the Hospital relative to the Hospital population. *See* 42 C.F.R. § 405.402(a) (1982). (emphasis in the original).

*University of Cincinnati v. Bowen*, 875 F.2d at 1212.

## THE ISSUE OF ALLOWABILITY

■ The Administrator found that even if the overhead costs of the GME program did not violate the redistribution principle of 42 C.F.R. § 413.85(c), the costs would still not be allowable GME costs because they are the overhead costs of the medical school instead of the hospital and because they are not related to the care of beneficiaries.

The Administrator acknowledges that 42 C.F.R. § 413.85(a)(1) provides for reimbursement of the net costs of approved educational activities and that the net costs of those activities are to be determined in accordance with 42 C.F.R. 4513.85(g) which states that a provider's total costs "include trainee stipends, compensation of teachers, and other direct and indirect costs of the activities as determined under the Medicare cost-finding principles in § 413.24." The Administrator concludes, however, that indirect costs in this context refers "to the administrative and general cost of the hospital, not the medical school." Administrator's Decision, p. 7. This interpretation conflicts with the plain language of § 413.85(g) when read in light of the related party rule, 42 C.F.R. § 413.17. Clearly, both direct and indirect costs of approved educational activities are reimbursable under § 413.85(g). It makes no sense to say that direct costs are reimbursable if incurred by a provider or a related medical school but that indirect costs are reimbursable only if incurred by the provider. This contradicts the provisions of 42 C.F.R. § 413.17 and the statutory mandate that the Medicare program pay its fair share of patient costs and ignores the evidence that during the year in question the Provider transferred $7 million to the medical school in support of the GME program.

Indirect costs are a necessary part of the cost of educational programs which contribute to the quality of patient care. Under the Administrator's interpretation, a "stand alone" teaching hospital would be entitled to recover the overhead costs of its GME program but a teaching hospital which re-

lies on the services of a medical school would not. Such an interpretation is arbitrary and unreasonable and contrary to the law as announced in *University of Cincinnati v. Bowen*, 875 F.2d at 1208, where, as noted previously, the court held that overhead costs of a GME program operated by a related medical school are ordinarily included as reasonable costs.

The Administrator asserts that his interpretation is consistent with longstanding Medicare policy stated in Intermediary Letter No. 78–7 issued in February, 1978. However, this Intermediary Letter clearly authorizes reimbursement for indirect costs of a related medical school of the very kind here in controversy. The intermediary letter begins as follows:

PROVIDER REIMBURSEMENT— COST TO RELATED ORGANIZATIONS—MEDICAL SCHOOL FACULTY COSTS—.

New instructions in this *Intermediary Letter* recognize as allowable hospital costs: (1) reasonable costs incurred by a teaching hospital for patient care services rendered by the faculty of a related medical school in the hospital and (2) reasonable costs incurred in the medical school that are related to the rendition of those services. Allowable faculty costs include direct salaries, applicable fringe benefits, FICA and unemployment taxes and workmen's compensation and may include travel and sabbatical leave costs, membership fees, and book allowances when directly applicable to services rendered by the medical school faculty. Allowable faculty-related costs incurred in the medical school are generally limited to "direct" costs and "space" costs associated with a medical library, physician office space and clerical support where the hospital does not have its own medical library or administrative structure and does not provide office space or clerical support to the medical school facility. Brief of Plaintiff, Ex. J. Physician office space and clerical support are two of the specific items claimed by the Provider and they are clearly examples of indirect or

overhead costs which, under this Intermediary Letter, are properly reimbursable costs of a related medical school. Thus, Intermediary Letter No. 78–7 does not support the Administrator's interpretation of the regulation but in fact supports the Provider's interpretation of that regulation.

The Administrator's position here is also contrary to the position taken in a Health Care Financing Administration (HCFA) Commentary dated September 29, 1989. In response to a comment about treatment of GME costs of a related medical school in which the commenter pointed out that in some instances GME activities may take place in space assigned to the medical school, HCFA responded in part as follows:

Certain identifiable activities conducted by the faculty of a related medical school, which are necessary for the clinical training function at the hospital, may represent allowable costs for Medicare program purposes....

These items and services must be necessary and directly related to the provision of medical school faculty services in the hospital and may not be duplicative of items and services furnished by the hospital. For example, if the hospital is unable to provide office space or clerical support to the physicians supervising its interns and residents, a portion of those costs that are incurred by the university medical school may be allowable ... 54 Fed.Reg. 40,302 (Sept. 29, 1989).

Brief of plaintiff, Volume II—Appendix N.

There is no evidence that the Provider itself has the ability to provide the necessary administrative structure, space and clerical staff needed to support the GME program without using the resources of the COM. The Administrator's interpretation of the regulations denying reimbursement on the ground that the GME overhead costs are the costs of the COM and not the Provider is contrary to the plain wording of the regulations and the Secretary's previous interpretations of those regulations.

The Administrator also denied reimbursement on the grounds that the Provider's GME overhead costs were not "related to the care of beneficiaries" and were not

"incurred for patient care services" (Administrator's decision, pp. 7, 8). The Sixth Circuit rejected such a limited interpretation of the Medicare regulations in *University of Cincinnati v. Bowen*, 875 F.2d at 1211, when it held, "The Secretary's argument fails for the simple reason that section 405.421(c) [now § 413.85(c)] only requires educational 'activities' that ultimately enhance the quality of Medicare patient care, not direct 'services' to those patients."

The Administrator states, "Medicare will not reimburse costs of the medical school which are duplicative of costs of the hospital and which are not related to the patient care furnished in the hospital." Administrator's Decision, p. 9. There is no evidence in the record that the overhead costs in question are duplicative of costs of the hospital, nor is there any evidence that the costs are not related to the patient care furnished in the hospital. Indeed, the evidence indicates that they are related to the patient care furnished in the hospital because the residents and interns and the physician faculty members supervising them could not function without office space, professional and clerical staff and supplies.

The record shows that in calculating the overhead costs of the GME program, the Provider adopted a methodology which excluded all educational costs which were not related to patient care. All undergraduate educational expenses were excluded. Costs related to the five nonclinical departments were excluded. The GME overhead costs represent the allocated administrative costs of each COM clinical department. They include the salaries and fringe benefits of professional nonphysician working staff, including office managers and programmers who support the faculty members, clerical personnel and secretaries working for them and their professional staffs, space costs consisting of depreciation, utilities and related costs of the offices they occupy and the costs of supplies they consume. Any teaching hospital would necessarily incur such overhead and administrative costs simply because the physicians operating such programs could not function without support staff, clerical employees, office space and supplies.

## CONCLUSION

Plaintiff's motion for summary judgment is well taken. The Clerk shall enter judgment in favor of the plaintiff reversing the Administrator's decision of October 15, 1990 and remanding this case to the Secretary of the United States Department of Health & Human Services with instructions to allow plaintiff's claim for GME overhead costs for the 1985 cost-reporting year in the amount of $765,000.00 with interest pursuant to 42 U.S.C. § 1395oo (f)(2).

It is so ORDERED.